This is a libel suit brought by Dan Wiley against WKRG-TV, Inc. Wiley's complaint charges that WKRG libeled him in a televised news report about a public meeting held at the Orchard Baptist Church concerning a proposed landfill site. At the time of the alleged libel Wiley was a member of the Mobile County Commission, and the report stated that persons at the meeting charged that Wiley would profit from the proposed landfill.
WKRG made a motion for summary judgment, contending that under the pleadings and depositions on file it was entitled to judgment because its broadcast of the allegedly libelous material was privileged, being an accurate and complete report, or a fair abridgement, of an occurrence at a public meeting pertaining to a matter of public concern. The trial court denied the motion but found, in accordance with A.R.App.P. 5 (a), that
 "this interlocutory order involves controlling questions of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from this order would materially advance the ultimate termination of the litigation, and that the appeal would avoid protracted and expensive litigation."
This Court granted permission to appeal. Rule 5, A.R.App.P.
WKRG argues that the privilege set forth in Restatement ofTorts (Second), § 611 (1977), should be adopted as the law of this State and that, under this privilege, WKRG cannot be held liable for its broadcast in this instance. The Restatement section reads:
"Report of Official Proceeding or Public Meeting
 "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."
It appears that any such privilege heretofore recognized in this State is much more limited, and would correspond at most to the "official action or proceeding" portion of the rule. Code 1975, § 13A-11-161, provides:
 "The publication of a fair and impartial report of the return of any indictment, the issuance of any warrant, the arrest of any person for any cause or the filing of any affidavit, pleading or other document in any criminal or civil proceeding in any court, or of a fair and impartial report of the contents thereof, or of any charge of crime made to any judicial officer or body, or of any report of any grand jury, or of any investigation made by any legislative committee, or other public body or officer, shall be privileged, unless it be proved that the same was published with actual malice, or that the defendant has refused or neglected to publish in the same manner in which the publication complained of appeared, a reasonable explanation or contradiction thereof by the plaintiff, or that the publisher has refused upon the written request *Page 619 
of the plaintiff to publish the subsequent determination of such suit, action or investigation."
See Wilson v. Birmingham Post Co., 482 So.2d 1209 (Ala. 1986);Fulton v. Advertiser Co., 388 So.2d 533 (Ala. 1980); Browningv. Birmingham News, 348 So.2d 455 (Ala. 1977).
This Court in Browning, supra, reiterated the test for the existence of a qualified privilege as it had been set forth inWillis v. Demopolis Nursing Home, Inc., 336 So.2d 1117, 1120
(Ala. 1976), and Berry v. City of New York Ins. Co., 210 Ala. 369,98 So. 290 (1923):
 "Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged, if made in good faith and without actual malice. . . . The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken."
348 So.2d at 458 (emphasis in Browning).
We certainly do not think that a reporter has a duty to repeat a defamatory falsehood, but the Restatement rule would have the publication privileged even if the publisher knows that the statement was false, so long as the report is a fair and accurate rendition of what transpires at the public meeting. The premises of this rule are that (1) the publisher is making a "true" statement of the events of the meeting, regardless of the truth or falsity of the statements made in the meeting, and (2) the publisher is entitled to a privilege in the publication of such public meetings on matters of public concern because they are newsworthy, that is, the general public has a legitimate interest in hearing about the meeting.
The first premise clearly cannot stand as a justification without the second, because the repetition of a defamatory statement generally constitutes a new publication and is actionable. As to the second premise, we deem it instructive that the United States Supreme Court has rejected a "newsworthiness" test for determining whether a defamatory publication is protected by the First Amendment. Such a test was implied in the plurality opinion in Rosenbloom v.Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296
(1971), but was disapproved in Gertz v. Robert Welch, Inc.,418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Thus, we do not think that WKRG has a constitutional right to repeat false statements simply because they were made at a public meeting on a matter of public concern.
Of course, Wiley was a public official at the time of the meeting, and the statements at least implied that he was misusing his public office; apparently the county commission, of which Wiley was president, had a role in the approval of the landfill site. As a public official, Wiley would have to prove that WKRG broadcast the allegations with knowledge of their falsity or with reckless disregard of their truth or falsity.New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710,11 L.Ed.2d 686 (1964). The materials submitted in support of and in opposition to the summary judgment motion raise a clear factual question on this issue, as we shall now show with a further recitation of the facts in the record.
A transcript prepared by WKRG of the news report shows that Curt Fonger introduced the report from WKRG's studio and Mark King continued with a live report from the location of the meeting:
 "Good evening . . . Do you want a landfill in your neighborhood? Well . . . neither do some homeowners in west Mobile! And they make a serious charge! According to this group . . . the county commission `fixed' plans for two landfills . . . because commission president Dan Wiley would profit! Mark King was at a *Page 620 
citizen's meeting tonight! Let's learn about it from him! Mark!
 "Curt . . . about one-hundred citizens from west Mobile turned out for the meeting at the Orchard Baptist Church. They came to map strategy for their fight.
 "These people are upset because the A.J.B. Corporation has asked for permits to operate private sanitary landfills on two locations in Howells Mill Road-Schillingers Road area. They say the two sites would not be suitable for landfills . . . because they're a part of the water shed for Hamilton Creek which eventually leads into the City of Mobile's water supply.
 ". . . None the less, they believe the county has plans to grant permits for the private landfills and then contract with the A.J.B. Corporation, to use the landfills for the counties [sic] trash.
 ". . . They claim a recent announcement that the county landfill near Irvington would have to be closed soon is part of this plan. . . . And they say public officials would profit from the deal.
 "[Some items in the record would indicate that the following two paragraphs are transcriptions of statements made by Cecil Crowe, a citizen at the meeting:]
 "The rumor says that Dan Wiley and Bay Haas are part owners of this corporation . . . And I think when we go down there Monday, that we're entitled to know, if there's anybody down there that's working both sides of the street.
 ". . . I mean, is he part owner of a corporation that's trying to do business with the county, . . . if he is, we need to know it . . . if he isn't, we need to know it . . .
 ". . . I contacted both commissioner Wiley and Mr. Haas at their homes tonight. . . . Wiley says the rumors are ridiculous and he says he doesn't know what the A.J.B. Corporation is. Haas says the charges are totally untrue.
 ". . . Anyway, the citizens plan to turn out in large numbers for the county commission meeting on Monday morning. They've also hired a geologist to double check soil tests the state has run on the two sites. Curt."
Wiley argues that the report was not an accurate report of what was said at the meeting, that it was a report of what one person, not what the "homeowners" or the "people," said, and that it presented only one side of the story. These arguments are made primarily to show abuse of the Restatement privilege. If Wiley can prove that WKRG thus falsified the report, he would not only show the actual malice required by Sullivan but also defeat the claimed privilege.
Cecil Crowe, one of the participants at the meeting, apparently made most of the allegedly libelous remarks that WKRG repeated in its report. There is some indication that the following portion of the above-quoted transcript is from a videotape of Cecil Crowe actually making the statements:
 "The rumor says that Dan Wiley and Bay Haas are part owners of this corporation . . . and I think that when we go down there [to the county commission meeting] Monday, that we're entitled to know if there's anybody down there working both sides of the street.
 ". . . I mean, is he part owner of a corporation that's trying to do business with the county, . . . if he is, we need to know it . . . if he isn't, we need to know it."
Marginal notations on the transcript indicate that Crowe was on camera, but do not clearly indicate that he made these statements. King, in his deposition, said that he taped Crowe making these statements. It appears, however, that King did not tape Crowe when he first made the statements but asked him after he finished to repeat them for the camera if he spoke to the group again. One of the depositions indicates that Crowe later denied having accused Wiley, claiming that he only said he wanted to find out the truth. As presented in the record, this is hearsay, and the record is ambiguous as to whether Crowe denied making charges at the public meeting *Page 621 
or at the later county commission meeting. Furthermore, although the record does not indicate that Crowe spoke for the group as a whole or that any designated spokesman made these statements, there is some indication that the group applauded Crowe's statements. Thus, there is some factual dispute as to the accuracy of the report on the alleged accusation.
Even more significant is the fact that WKRG had substantial information that the accusation was not true, but broadcast the report anyway and made no mention of this information. The original source of the accusation was a rumor sheet placed anonymously in the residents' mailboxes about two weeks before the meeting. Barbara Shaw, a reporter for WKRG, investigated the rumor at the time. She talked to James R. Payne, the owner of A.J.B. Corporation, who denied that Wiley or Haas had any interest in A.J.B. Payne's attorney called Shaw and offered to show her documents proving Wiley owned no stock in A.J.B. Wiley was out of the country at the time of this initial investigation, but an attorney for the county called Shaw and told her not to publish the rumor because it was false. On March 14, WKRG broadcast Shaw's report that the citizens were concerned about the proposed landfill but did not mention the rumors about Wiley at that time.
King testified in his deposition that he was aware when he made the March 25 broadcast that Payne had denied that Wiley owned any part of A.J.B. Corporation. Wiley stated in his deposition that when King called him before making the March 25 report, he not only denied knowing anything about A.J.B. Corporation, but also told King that Shaw had previously investigated the matter. Given the record before us, we cannot say that Wiley would be unable to sustain a libel action, including proof of Sullivan actual malice by clear and convincing evidence. See Pemberton v. Birmingham News Co.,482 So.2d 257 (Ala. 1985). Therefore, the trial court did not err in denying the motion for summary judgment. The interlocutory ruling is affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, ALMON, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.
MADDOX, J., concurs in the result.