On Application for Rehearing

PER CURIAM.
This court’s opinion of December 3, 2010, is withdrawn, and the following is substituted therefor.
Benjamin L. Little appeals from a summary judgment entered by the Calhoun Circuit Court (“the trial court”) in favor of Consolidated Publishing Company (“CPC”) and Megan Nichols.
The evidence the parties submitted in support of, and in opposition to, Nichols and CPC’s motion for a summary judgment tended to show the following. Little, a Christian minister, has been an Anniston city councilman since his election in 2000. In early 2007, Little, acting on the recommendation of. Phillip White, then mayor of Uniontown, contacted Yolanda Jackson, a human-resource-management consultant, about possibly addressing what Little considered to be the substandard human-resources practices of the City of Anniston (“the city”). On February 10, 2007, Little drove to Uniontown to pick up Jackson, and the two of them went to Demopolis for dinner, all at the expense of the city. Little and Jackson talked for between 90 minutes and 2 hours, and then Little drove Jackson back to Uniontown, dropped her at the city hall, and returned to Anniston. The next day, Jackson sent her résumé to Little, indicating her willingness to assist in developing new human-resources policies and procedures for the city. Little recommended Jackson to the other city-council members, but, at that time, they apparently showed little interest in having Jackson perform an audit of the city’s human-resources practices.
A year later, however, the city council renewed its interest in the matter and Little, after meeting again with Jackson in Uniontown, arranged for Mayor White and her to attend a city-council meeting in April 2008. At that meeting, Jackson informed the council of her qualifications and Mayor White related the success of Jackson’s efforts in helping Uniontown with its human-resources problems. The city council voted 5-0 to pay Jackson $2,500 to perform an audit of the city’s human-resources practices. Following the council meeting, Little took Jackson and Mayor White to dinner in Anniston.
Jackson performed the audit. During the auditing process, Jackson did not meet personally with Little, but she did talk with him on the telephone several times. After the audit was completed, Little drove to Uniontown and talked with Jackson about the audit for about 20 minutes. The record does not indicate any other interaction between Little and Jackson.
In November 2008, John Spain was elected to the Anniston city council. At a city-council meeting conducted at some point in February 2009, Spain questioned the usefulness of the audit conducted by Jackson and stated his intention to investigate the matter. Nichols, a reporter for The Anniston Star, a newspaper owned and published by CPC, interviewed Spain and Little after the meeting. Based on her *519 notes from the meeting and her interviews, Nichols wrote an article that appeared on the front page of The Anniston Star on February 19, 2009, under the headline: “Spain wants investigation into HR audit ordered by Little.” In that article, Nichols related some facts and the opinions of certain city officials, including Spain, that indicated that the audit had been conducted poorly and had yielded nothing productive. In addition, the article stated:
“Spain also said there is a buzz in the city that Little had or has a personal relationship with Jackson and that’s why he pushed for her hiring last year.
“Tf this is not the case, it’s very unfair to Councilman Little,’ Spain said. Tf there is substance to it, it needs to be disclosed.’
“Little, who is not married, said he is not involved personally with Jackson.
“T know a lot of people,’ he said. ‘But I’ve never had a relationship with that girl. And if I did have a relationship with her, that wouldn’t relate to the city anyway.’
“Several attempts to reach Jackson this week failed.”
Nichols submitted an affidavit in support of the motion for a summary judgment in which she stated that, in her interview with Spain, he made the statements that were attributed to him in the article. Nichols stated that it had been her understanding from statements made by Spain during that interview that “there were rumors in the community that Council member Little may have been dating a consultant hired by the City.” In her deposition, Nichols clarified that Spain had also indicated to her that there was a “buzz” that Little had based his decision to “push” for Jackson’s hiring because of their rumored personal relationship. In both her affidavit and her deposition testimony, Nichols attested that she had quoted Spain and Little accurately in the article. Bob Davis, the editor of The Anniston Star, testified in his deposition that he had contributed to the article by noting that Little was not a married man, in order to give the article “greater context.”
Nichols stated in her affidavit that she did not write the article out of ill will, spite, or malice toward anyone. She stated that she was simply reporting the words of Spain as told to her as part of her job as a reporter, which included covering the meetings of the city council. Nichols further attested in her affidavit that she had no concerns or doubts about the accuracy of the information quoted in the story. She stated that she had not investigated whether, in fact, a rumor was circulating about Little and Jackson; she could verify only that Spain had asserted as much. As for checking the factual basis of the alleged rumor, Nichols testified that she had asked Little about the rumor and had attempted to contact Jackson. Nichols and Davis both testified that they had no reason to doubt the veracity of Little’s denial. Although Nichols had not been able to reach Jackson, the article was published. Harry Brandt Ayers, the publisher of The Anniston Star, testified that he knew Spain did not like Little but that no editor or other person employed by the newspaper had attempted to ascertain the factual basis of Spain’s statements.
On February 20, 2009, The Anniston Star published an editorial that Davis had written titled: “Ben’s greatest hits: A litany of crumbling plans.” In that editorial, Davis wrote:
“Most recently we’ve learned more details about Councilman Ben Little’s sweetheart HR audit deal. At Little’s urging, Anniston paid Yolanda Jackson of Uniontown $2,500 to examine the city’s human resources practices. Working for what city officials say is a *520 few hours and she claims was several days, Jackson produced a report that is virtually useless. Not one recommendation has been implemented.”
Davis then recounted several other endeavors Little had undertaken while he was a councilman that Davis considered to have been unsuccessful.
On February 24, 2009, counsel for Little wrote a letter to Ayers, requesting that the newspaper retract certain statements contained in the article and the entire editorial, both of which Little considered to be false and malicious. Specifically, Little’s counsel maintained that Little had not ordered the audit or hired Jackson; rather, he said, the city council had voted 5-0 to hire Jackson to conduct the audit. The evidence, construed in a light most favorable to Little, shows that Nichols attended the meeting at which the city council voted to hire Jackson and that Nichols knew that Little had not “ordered” the audit, as stated in the headline above the initial article reporting that Spain wished to investigate the circumstances surrounding the audit. Little’s counsel also asserted that the article had repeated false gossip provided by Spain, who was described in the letter as “a well known opponent of Mr. Little on the city council,” to the effect that Little had “pushed” for Jackson’s hiring because Little had a personal relationship with Jackson. Little’s counsel further objected to the characterization of the audit in the editorial as a “sweetheart” deal that Little had “urged” the council to make.
On February 26, 2009, Little’s counsel sent a proposed retraction to counsel for CPC. On February 27, 2009, in an article titled “For the Records” that was printed on page two of that day’s edition of The Anniston Star, the following appeared:
“A headline for a Feb. 19 article in The Anniston Star mischaracterized An-niston City Councilman Ben Little’s role in hiring a contractor to audit the city’s human resources practices. In fact, the council as a whole ordered the audit. The Star apologizes to Councilman Little for this error.
“Furthermore, the article quoted another city councilman concerning the existence of rumors circulating that Little had some type of personal relationship with the contractor hired by the entire council. In context, it was clear that the person quoted was not stating whether or not the rumors were true and the person was expressly quoted as saying that if the rumors were untrue, those spreading the rumors would be unfair to both Little and the contractor. The An-niston Star wishes to make absolutely clear that it has not and is not alleging that such a relationship exists or that such rumors have a factual basis. In fact, Little has vehemently denied such a relationship exists.”
Later that day, Little’s counsel •wrote CPC’s counsel, objecting because he had not reviewed or approved the foregoing article before it was published and demanding that different wording appear on the front page of the newspaper. No further correction appeared in the pages of The Anniston Star.
On March 24, 2009, another editorial appeared in The Anniston Star in which it was recounted that some individuals had taken copies of past editorials that were critical of Little and had “penned threats to Little’s life in the margins.” That editorial quoted Little as blaming the editorial board of The Anniston Star for provoking the death threats through its “vicious and incorrect” editorials. That editorial then stated:
“Little has so far proven no major inaccuracies in the editorials. In fact, the paper did run a minor correction and an apology on a news story, after the mis *521 take was brought to the paper’s attention. But Little has presented no evidence of ‘viciousness’ or ‘incorrectness’ to the newspaper, even though he has been invited to.”
That editorial ended with an invitation for Little to use space in the newspaper for any rebuttal. In a letter dated March 27, 2009, Little’s counsel objected to the characterization of the earlier “For the Records” article as a “minor correction” and asked for another retraction. The request was not granted.
Little filed a complaint against CPC and Nichols, as well as several fictitiously named defendants, on May 18, 2009. In that complaint, Little alleged that CPC and Nichols had maliciously published false and defamatory statements about him in the February 19 article and in the February 20 editorial that, he claimed, had not been effectively retracted. Little further asserted:
“[Little] avers that [CPC] has waged a long campaign to libel and vilify Little in the Anniston community calling him names such as ‘a crank.’ The object of the campaign was racial in nature and was intended to make [Little] an object of scorn and hatred in the Anniston, Alabama community because of [Little’s] efforts to aid the African-American community to have a fair voice in Anniston community affairs, even if that voice is not pleasing to the Anniston white community. The effect of the campaign of [CPC] has been to create an atmosphere of hatred of Little in which [CPC’s] views of the good of the community was believed to require the elimination of Little from the affairs of the City of Anniston.”
Little averred that, as a direct result of the “campaign of vilification” committed by CPC, death threats written in the margin of The Anniston Star editorials had been placed in public places throughout Anni-ston. Little asserted claims of libel and the tort of outrage and sought compensatory and punitive damages.
CPC and Nichols filed an answer and a counterclaim pursuant to the Alabama Litigation Accountability Act. See § 12-19-270 et seq., Ala.Code 1975. After taking the deposition of Little, CPC and Nichols filed a motion for a summary judgment on September 4, 2009. See Rule 56, Ala. R. Civ. P. Little responded with a brief in opposition to the motion, but he also requested to postpone a hearing on the motion in order to complete discovery. See Rule 56(f), Ala. R. Civ. P. After completing much of that discovery, Little filed a second response to the summary-judgment motion. The trial court heard arguments on the motion on February 22, 2010. The trial court entered a summary judgment in favor of CPC and Nichols as to both claims set out in the complaint. Little then timely appealed to the Supreme Court of Alabama; that court transferred the appeal to this court, pursuant to § 12-2-7(6), Ala. Code 1975.[1]
Little contends that the trial court erred in granting the summary-judgment motion on his claim of libel. Specifically, Little asserts that he presented substantial evidence creating a genuine issue of material fact as to whether Nichols and CPC had *522 maliciously published a false and defamatory rumor about Little, i.e., that he had “pushed” for Jackson’s hiring because he was in a personal relationship with her. Therefore, he contends, the trial court improperly entered a summary judgment in favor of Nichols and CPC as to his libel claim.
Among the grounds on which CPC and Nichols moved for a summary judgment was that the statements at issue were not published with “constitutional malice” and that, therefore, they are protected from an action for damages by the First Amendment of the United States Constitution. See New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
When a plaintiff in a libel action is a public official and the alleged defamatory statement relates to his conduct as a public official, the plaintiff must establish “constitutional malice” by clear and convincing evidence. Gary v. Crouch, 923 So.2d 1130, 1138 (Ala.Civ.App.2005) (citing Wiggins v. Mallard, 905 So.2d 776 (Ala.2004); and Smith v. Huntsville Times Co., 888 So.2d 492 (Ala.2004)). “Constitutional malice” refers to the standard set forth in New York Times Co. v. Sullivan, supra. “This standard is satisfied by proof that a false statement was made ‘ “with knowledge that it was false or with reckless disregard of whether it was false or not.” ’ ” Smith, 888 So.2d at 499 (quoting Harte-Hanks Commc’ns, Inc. v. Connaughton, 491 U.S. 657, 659, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989), quoting in turn New York Times v. Sullivan, 376 U.S. at 279-80).
In the context of a summary-judgment motion as to a claim of libel involving a public official, the United States Supreme Court has explained:
“ ‘[Wjhere the New York Times [Co. v. Sullivan ] “clear and convincing” evidence requirement applies, the trial judge’s summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that eviden-tiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual [constitutional] malice, clearly a material issue in a New York Times [Co. v. Sullivan ] case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual [constitutional] malice by clear and convincing evidence or that the plaintiff has not.’
“Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (footnote omitted). The Supreme Court of Alabama has reiterated that ‘[a] trial judge is not required “to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.” ’ Camp v. Yeager, 601 So.2d [924,] 927 [ (Ala.1992) ] (quoting Anderson, 477 U.S. at 249, 106 S.Ct. 2505).”
Gary v. Crouch, 923 So.2d 1130, 1138-39 (Ala.Civ.App.2005). On appeal from a summary judgment, this court reviews the case de novo, applying the same standards as the trial court. See id.
“When determining if a genuine factual issue as to actual [constitutional] malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under New York Times [Co. v. Sullivan, 376 U.S. 254 (1984) ]. For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find [constitu *523 tional] malice by clear and convincing evidence.”
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making the determination whether the public figure has produced evidence of a sufficient “caliber or quantity to allow a rational finder of fact to find [constitutional] malice by clear and convincing evidence,” id., the court must believe the evidence submitted by the public figure and all justifiable inferences must be drawn in his or her favor. 477 U.S. at 255.
The United States Supreme Court has explained:
“In [Sullivan ], ... the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In Garrison v. State of Louisiana, 379 U.S. 64 (1964), ... the opinion emphasized the necessity for a showing that a false publication was made with a ‘high degree of awareness of ... probable falsity.’ 379 U.S., at 74. Mr. Justice Harlan’s opinion in Curtis Publishing Co. v. Butts, 388 U.S. 130, 153 (1967), stated that evidence of either deliberate falsification or reckless publication ‘despite the publisher’s awareness of probable falsity’ was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.”
St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (emphasis added).
In this ease, Nichols wrote an article reporting on a city-council meeting during which the usefulness of a human-resources audit was called into question. During the meeting, Spain discussed his intention to investigate that audit, which, Spain asserted, Little had “pushed” the city council to undertake. After the meeting, Nichols spoke to Spain further about his call for an investigation into the audit. The article stated that “Spain ... said there is a buzz in the city that Little had or has a personal relationship with [Yolanda] Jackson and that’s why he pushed for her hiring last year [to conduct an audit for the city].” The article also quoted Spain as saying, “If this is not the case, it’s very unfair to Councilman Little,” and “If there is substance to it, it needs to be disclosed.” Nichols spoke to Little about Spain’s assertions regarding the audit, and, in the article, she wrote that Little had denied the truth of the rumor. Nichols also testified that she had attempted to contact Jackson about Spain’s assertion but that she had been unable to reach Jackson.
In reviewing the record, we found no evidence indicating that, at the time the article was published, Nichols or anyone else employed by CPC subjectively knew that Little did not have a personal relationship with Jackson and that Little had not recommended Jackson to perform the audit based on that personal relationship. Based on the evidence in the record on appeal, we conclude that Little did not present sufficiently clear and convincing evidence indicating that CPC and Nichols published the rumor with knowledge of its falsity.
Likewise, Nichols’s and Davis’s testimony indicating that they had no reason to doubt Little’s denial cannot be construed as clear and convincing evidence indicating that they acted “with reckless disregard of *524 whether [the allegedly defamatory statement] was false or not,” Sullivan, 376 U.S. at 280, ie., that they acted with a “high degree of awareness of ... probable falsity.” Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). In discussing the clear-and-convincing quantum of proof needed to show constitutional malice, ie., actual malice, the United States Court of Appeals for the Second Circuit wrote: “Surely liability under the ‘clear and convincing proof standard of Sullivan cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.” Edwards v. National Audubon Soc’y, Inc., 556 F.2d 113, 121 (2d Cir.1977). See also Harte-Hanks Commc’ns, Inc. v. Connaughton, 491 U.S. at 660 n. 1 (quoting Edwards with approval).
In claiming that Nichols and CPC acted with reckless disregard as to whether the allegedly defamatory statements were false, Little points to what he believes should have been done before the article containing the rumor was published. For example, Little seems to argue that Nichols should have investigated whether, in fact, a rumor was circulating about Little and Jackson. He also argues that Nichols and CPC should have done more investigation into the factual basis of the alleged rumor. However, failing to investigate the truth behind Spain’s assertions as to why he was requesting an investigation into the audit in the manner Little believed should have been done before the article was published is insufficient to demonstrate that Nichols or CPC acted with reckless disregard for the truth. See St. Amant v. Thompson, 390 U.S. at 731, 88 S.Ct. 1323.
CPC acknowledged that the headline above the article in question inaccurately stated that Little “ordered” the audit performed by Jackson. Apparently, an unknown copy editor drafted that headline. Roughly a week after the article was published, The Anniston Star published an article correcting the mistake in the headline, noting that the entire city council, not Little acting by himself, had ordered the audit. The text of the original article itself stated that the city council had hired Jackson to conduct the audit and that Spain had asserted that Little had “pushed for her hiring.” Whether Little ordered the audit or merely “pushed” for it is immaterial. The gist of the publication of Spain’s comments, which is the heart of Little’s libel claim, is that Little’s alleged personal relationship with Jackson allegedly led the city to pay for a supposedly worthless audit, ie., that Little abused his public office. Whether Little ordered the audit or merely recommended it does not alter the nature of the alleged abuse of public office. Cf. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (“[A] deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of [determining constitutional malice] unless the alteration results in a material change in the meaning conveyed by the statement.”).
Based upon our review of the record, we conclude that a reasonable jury could not find by clear and convincing evidence that Nichols and CPC acted with constitutional malice in publishing the alleged defamatory statements. Therefore, Little cannot sustain his libel claim against Nichols and CPC. Accordingly, the trial court properly entered the summary judgment in favor of Nichols and CPC as to Little’s libel claim.
Judge Moore, in his dissent, relies on WKRG-TV, Inc. v. Wiley, 495 So.2d 617 (Ala.1986), as well as other cases applying *525 common-law principles that were decided before 1986, for the proposition that, when reporting on an allegedly defamatory statement made by a third party in a public meeting, a news reporter’s key inquiry must be whether the content of that statement is substantially true, not whether the statement itself is being accurately reported. 83 So.3d at 532. In Wiley, our supreme court affirmed the denial of a motion for a summary judgment, appealed pursuant to Rule 5, Ala. R.App. P., and held that a television station did not have a constitutional right to repeat allegedly false statements about a public official “simply because they were made at a public meeting on a matter of public concern.” Wiley, 495 So.2d at 619. We note, however, that Wiley, which was decided in September 1986, does not mention the United States Supreme Court’s holding in Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), decided in April 1986, regarding speech that is of public concern. In Hepps, the United States Supreme Court noted that, “[w]hen the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law.” 475 U.S. at 775. We cannot reconcile the United States Supreme Court’s holding in Hepps with our supreme court’s holding in Wiley.
“The second paragraph of Article VI of the United States Constitution sets out what is known as the Supremacy Clause:
“ ‘This Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding.’
“The United States Supreme Court has repeatedly held that ‘[i]t is basic to this constitutional command that all conflicting state [laws] be without effect.’ Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128-29, 68 L.Ed.2d 576 (1981) (citing M’Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819)). Therefore, when federal and state laws conflict, the federal law triumphs and preempts the conflicting state law.
“Not only are conflicting state statutes and regulations preempted, but state common law rules are also preempted to the extent that they conflict with federal law.”
Cantley v. Lorillard Tobacco Co., 681 So.2d 1057, 1059 (Ala.1996). Because our supreme court’s holding in Wiley conflicts with the constitutional protections the First Amendment affords in circumstances such as those in the instant case, as those protections have been articulated by the United States Supreme Court’s holding in Hepps, this court is bound to follow the opinion of the United States Supreme Court.
Moreover, we note that, although no Alabama appellate court has followed Wiley for the proposition the dissenting opinion relies on in this case, both this court and our supreme court have followed Hepps subsequent to the release of Wiley. See Ex parte Rudder, 507 So.2d 411, 416 (Ala.1987) (citing Hepps for the proposition that, “where it is determined that a private individual is alleging defamation, there must be a determination of whether the defamatory speech involves a matter of public concern”); see also Forrester v. WVTM TV, Inc., 709 So.2d 23 (Ala.Civ.App.1997) (same).
*526 Little also contends that the trial court erred in entering the summary-judgment on his tort-of-outrage claim. Specifically, he asserts that he produced substantial evidence creating a genuine issue of material fact as to whether CPC committed acts of outrageous conduct by publishing what Little said were racially motivated attacks on him and that those attacks caused him to be subjected to death threats. Little also asserts that the trial court erred in concluding that his tort-of-outrage claim was subsumed in his libel claim. Alabama law recognized the tort of outrage or, as our caselaw also refers to it, intentional infliction of emotional distress, Stewart v. Matthews, 644 So.2d 915, 918 (Ala.1994), in American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1980), when the supreme court held:
“[Ojne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, Lability ensuing only when the conduct is extreme.... By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.”
394 So.2d at 365. That tort has since been limited by caselaw to only a few factual situations. See Michael L. Roberts & Gregory S. Cusimano, Alabama Tort Law 23.0 (2d ed.1996). Little argues that this court should now expand the cause of action to encompass situations in which a newspaper publisher, motivated by racial bias, issues libelous denunciations of a public official that cause unknown third persons to issue death threats to that public official. Little also argues that the claim should not be considered to be subsumed in the tort of libel.
Some caselaw cited by Little, who is African-American, indicates that courts of other jurisdictions have recognized that a defendant may be liable for outrageous conduct in allowing a hostile work environment in which a plaintiff is forced to endure racial taunts or slurs. See Contreras v. Crown Zellerbach Corp., 88 Wash.2d 735, 736, 565 P.2d 1173, 1174 (1977); Alcorn v. Anbro Eng’g, Inc., 2 Cal.3d 493, 496, 86 Cal.Rptr. 88, 89-90, 468 P.2d 216, 218 (1970); see also Gomez v. Hug, 7 Kan.App.2d 603, 604, 645 P.2d 916, 918 (1982); and Jones v. Fluor Daniel Servs. Corp., 959 So.2d 1044, 1045 (Miss.2007). The holdings of those cases do not readily translate to the situation in this case because Little has not presented any evidence indicating that the editors of The Anniston Star used any racial epithets against Little while exercising a position of authority over him. Nevertheless, Little argues that, based on those cases, we should hold that a newspaper commits the tort of outrage when it wrongfully or falsely criticizes a public official based on improper racial motivations.[2]
We need not decide that question, however, because Little has not presented substantial evidence to support his theory. When viewed in a light most favorable to Little, the evidence shows that, since he became a councilman, many editorials printed in The Anniston Star have criticized Little’s leadership, policy choices, and effort. It appears that Little has taken positions on several subjects of political *527 interest that conflict with the stance of the editorial board of the newspaper, particularly regarding a dispute as to the best and highest use of Fort McClellan, a topic of much public debate in Anniston. Little testified that he believed that those editorials stemmed not from legitimate public debate, but from the fact that he is an African-American and refuses to “kowtow” to the wishes of the ownership of The Anniston Star. To support his opinion, Little presented evidence indicating only that his name had appeared in the newspaper a disproportionate number of times when compared to his Caucasian counterparts. CPC countered that it had printed more stories about Little solely because of his outspokenness on topics of public interest. The evidence submitted by Little hardly constitutes substantial evidence indicating that CPC has instituted a campaign against him based on improper racial motivations. See § 12-21-12(a), Ala. Code 1975 (requiring proof of “substantial evidence” in order “to submit an issue of fact to the trier of the facts”); and West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989) (defining “substantial evidence” as “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved”).[3]
We also need not decide whether, absent an improper racial motivation, a newspaper can be held liable for outrageous conduct when its readers instigate death threats against a public official based on false or misleading information contained in editorials. Little has couched his entire argument regarding his tort-of-outrage claim specifically to include the racial component. This court cannot make and address legal arguments for an appellant. See Dunlap v. Regions Fin. Corp., 983 So.2d 374, 378 (Ala.2007).
Because Little has not presented substantial evidence to support his tort-of-outrage claim, the trial court properly entered a summary judgment on that claim. Hence, we need not consider Little’s argument that his claim was not subsumed in his libel claim.
For the foregoing reasons, the judgment of the trial court is affirmed.
APPLICATION GRANTED; OPINION OF DECEMBER 3, 2010, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
THOMAS, J., concurs.
THOMPSON, P.J., and BRYAN, J., concur specially.
MOORE, J., concurs in part and dissents in part, with writing, which PITTMAN, J., joins.

. The trial court did not rule on the counterclaim filed by CPC and Nichols; however, "[o]ur caselaw has ... clarified that the failure of a trial court to specifically reserve jurisdiction over an [Alabama Litigation Accountability Act] claim in a summary-judgment order impliedly disposes of the claim and renders the summary judgment final. See Gonzalez, LLC v. DiVincenti, 844 So.2d 1196, 1201 (Ala.2002). Accordingly, we hold that the summary judgment is a final judgment that will support an appeal.” McGough v. G & A, Inc., 999 So.2d 898, 903 (Ala.Civ.App.2007).

. Little did not cite to the trial court or to this court any case directly on point.

. In another context, the Alabama Court of Criminal Appeals has stated that " 'statistics and opinion alone do not prove a prima facie case of [racial] discrimination.'" Banks v. State, 919 So.2d 1223, 1230 (Ala.Crim.App.2005) (quoting Woods v. State, 845 So.2d 843, 845 (Ala.Crim.App.2002)). We need not discuss at any length the type of evidence that would suffice to prove that a defendant acted with racial animus in an outrageous manner. We simply hold that the evidence presented in this case does not amount to substantial evidence of an improper racial motivation.