This is an appeal from a summary judgment granted in favor of the defendants, Birmingham Post Company (the Company); Angus McEachran, editor of the Birmingham Post-Herald (Post-Herald); and Katharine Biele, a reporter for the Post-Herald.
Plaintiff, Andrew Wilson, brought an action for defamation against the Company, McEachran, and Biele because of a front-page article which appeared in the Saturday, September 27, 1980, edition of the Post-Herald, under the headline, "Cuban refugee couple tell of mistreatment by Alabama sponsor." This article was published in the midst of the massive 1980 exodus of refugees from Cuba to the United States, when the efforts of the refugees boatlifted from Cuba to settle in this country were the subject of great concern and controversy. Incidents involving treatment of Cuban refugees had been reported previously in the Post-Herald.
Plaintiff Wilson describes himself as a missionary operating through the Apostolic Church in his Hale County, Alabama, community. As a part of his mission work, Wilson had sponsored between ten and twenty other Latin immigrants prior to his sponsoring José and Elena Torres. The Torreses arrived at Eglin Air Force Base in August 1980, and then went to Wilson's community. On September 26, 1980, the Torreses arrived in Birmingham in a "disoriented" state. They were taken to the Birmingham Police Department for assistance. The Torreses spoke only Spanish. Alton Morgado, a community services officer in the police department, who spoke fluent Spanish, was in charge of the Torreses' case. Morgado translated the police department interview with the Torreses into English for the benefit of the others present during Morgado's interrogation. Among those present during Morgado's questioning of the Torreses was reporter Biele, whose regular assignment for the Post-Herald was covering the police department.
As a result of the questioning, Morgado translated the Torreses' answers to the police officers as follows: Wilson had forced the Torreses to work in his restaurant for almost no compensation, had given them inadequate food, had not fulfilled his promise to take them to English classes, had housed them in facilities lacking running water and other necessities, and had told them that he was sending them back to Florida, where he had found them, but instead put them on a bus to Birmingham. Following the questioning, Morgado prepared a police incident report, which was assigned a complaint number. This report was dated and filed on September 29, two days after the article appeared in the Post-Herald. The incident report listed "Wilson, Andrew" as a "Suspect" and contained the following narrative:
 "A-1 [José Torres] his wife Elena are Cuban refugees; both were sponsered [sic] by E-1 [unknown] out of Eglin Air Base in Fla. A-1 states that D-1 [Wilson] housed them in a shack with no plumming [sic] facilities, worked both of them in this restaurant without pay, and provided little of the necessities of life for their comfort. (A-1 wife state that they had to bathe under a garden hose in the yard.) D-1 told A-1 wife that he was returning them to Eglin A.F.B. Fla., but only bought a ticket to B'ham. A-1 came to the police for assistance. C.S.O. contacted various organizations working with Cuban refugees — Int. Rescue Committee; Barbara Nagoski, 212-679-0010, which made arrangements for A-1 wife to be sponsored in Houston, Tx. A-1 wife will leave B'ham 9-29-80, 11:30 a.m. In the meanwhile, A-1 wife will be staying as guests of the Econo Lodge Motel, curtisy [sic] of the manager — Mr. Vance."
Biele attempted to contact Wilson before the story was published, but was unable to do so. *Page 1211 
Wilson contends that summary judgment was not appropriate because three key issues of genuine fact were presented: (1) whether or not the article published by the defendants was libelous; (2) whether or not the defendants were negligent in making the publication; and (3) whether or not the article was published with actual malice.
A summary judgment may be granted only when there is no genuine issue as to a material fact and the movant is entitled to judgment as a matter of law. Rule 56 (c), Ala.R.Civ.P.;Loveless v. Graddick, 295 Ala. 142, 325 So.2d 137 (1975).
The scintilla rule requires the court to admit the truthfulness of all evidence favorable to the plaintiff and thereby to remove all issues of credibility from the case and then determine if there are facts from which the trier of facts could reasonably and logically infer the ultimate facts upon which the claim depends; if so, the case must be decided by the trier of facts. Allstate Enterprises, Inc. v. Alexander,484 So.2d 375 (Ala. 1985). The scintilla rule must be applied to determine whether there is a genuine issue as to a material fact. Loveless v. Graddick, supra; Fulton v. Advertiser Co.,388 So.2d 533 (Ala. 1980), cert. denied, 449 U.S. 1131,101 S.Ct. 954, 67 L.Ed.2d 119 (Ala. 1981).
There was no issue of genuine fact as to whether or not the article was libelous.
Alabama has enacted an explicit statutory privilege protecting fair and accurate reports of criminal charges and official investigations such as that described in the Post-Herald news report at issue. Section 13A-11-161, Code of Alabama 1975, provides:
 "The publication of a fair and impartial report . . . of any charge of crime made to any judicial officer or body . . . or of any investigation made by any legislative committee, or other public body or officer, shall be privileged, unless it be proved that the same was published with actual malice. . . ."
This statute has not been construed by this Court. This statute is a codification of the common law as reflected in theRestatement (Second) of Torts, § 611 (1977): "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported."
Numerous cases protecting reports such as the one at issue in the instant case have been decided on the basis of this privilege. See Porter v. Guam Publications, Inc., 643 F.2d 615,616 (9th Cir.), cert. denied, 454 U.S. 940, 102 S.Ct. 475,70 L.Ed.2d 247 (1981) (the accurate report of a police investigation as reflected in a "daily police bulletin" of criminal complaints and arrest reports has been held privileged, even when the "police bulletin" was based on false charges made by the complainant); Mark v. Seattle Times, Inc.,96 Wn.2d 473, 635 P.2d 1081 (1981), cert. denied,457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339 (1982) (the privilege has also been extended to press reports of investigations summarized in the form of allegations contained in a prosecutor's affidavit of probable cause); Mathis v.Philadelphia Newspapers, Inc., 455 F. Supp. 406 (E.D.Pa. 1978) (police arrest reports); Piracci v. Hearst Corp., 263 F. Supp. 511,515 (D.Md. 1966), aff'd, 371 F.2d 1016 (4th Cir. 1967) (privilege applies to article based on police department records kept "as part of . . . daily routine" and as "the only official record of arrests" in the city); Francois v. CapitalCity Press, 166 So.2d 84 (La.Ct.App. 1964) (state police log book is "public record" within meaning of Louisiana statute, upon which press may rely).
The policy behind the privilege is that the public has a strong interest in receiving information in order to "monitor the conduct of its government" and its personnel, such as law enforcement officers, see Medico v. Time, Inc., 643 F.2d 134,141 (3d Cir. 1981), cert. denied, 454 U.S. 836, 102 S.Ct. 139,70 L.Ed.2d 116 (1981), and in order to be informed about matters involving *Page 1212 
the violation of laws, see Seymour v. A.S. Abell Co.,557 F. Supp. 951, 955 (D.Md. 1983). In construing the Maryland privilege, the Abell court stated:
 "[M]ost, if not all, police activity concerns matters involving the violation of the law. Simply put, police business is legal business. . . . Narrowly interpreting the phrase `matters involving violation of the law' to connote only formal criminal charges would be inconsistent with the policy underlying the Maryland privilege and unduly restrict the flow of valuable information to the public." Id. at 956.
In Stice v. Beacon Newspaper Corp., 185 Kan. 61, at 65,340 P.2d 396, at 400-01 (1959), the court recognized that the privilege applied to "news stories based upon interviews of police officials and reports of the police department." InTurnbull v. Herald Co., 459 S.W.2d 516, at 520-21 (Mo.App. 1970), a privilege was recognized for an article based on "the actions and activities of police officers."
Courts have also applied the privilege to articles based solely upon the oral comments of law enforcement officials. SeeBell v. Associated Press, 584 F. Supp. 128 (D.D.C. 1984) (Pennsylvania law) (privilege applies to report based on contacts with police investigator who had "pulled the file," court clerk, court administrator, and manager of facility where alleged misconduct occurred); Grund v. Bethlehem GlobePublishing Co., 9 Media L.Rep. (BNA) 1320 (Pa.Ct.Comm.Pls. 1982) (article based on statements of official police sources privileged); Gawel v. Chicago Am. Publishing Co., 1 Ill. App.3d 481, 274 N.E.2d 628 (1971) (publication based on information obtained from jail authorities); Turnbull v. Herald Co.,459 S.W.2d 516 (Mo. 1970) (policeman's opinion to reporter);Bierman v. Pulitzer Publishing Co., 627 S.W.2d 87
(Mo.Ct.Spec.App. 1981) (arrest warrant, bond, documents, affidavit); Stice v. Beacon Newspaper Corp., 185 Kan. 61,340 P.2d 396 (1959) (articles accusing plaintiff, who was an attorney and judge, of being leader of burglary ring based on interviews with policemen and police investigative reports into operation of burglary ring). In Nesbitt v. Multimedia, Inc., 9 Media L.Rep. (BNA) 1473 (W.D.N.C. 1982), for example, the court held that a news report based on the oral statements of a police detective was privileged, since it
 "relate[d] a police report of an investigation of criminal activities. Criminal conduct and activities have consistently been acknowledged as matters of public interest. . . . A newspaper has a valid recognizable interest in publishing reports of criminal investigations and activities and the public has a corresponding interest in receiving the information."
In Mathis v. Philadelphia Newspapers, Inc., 455 F. Supp. 406
(E.D.Pa. 1978), the police released photographs of persons they reported had been arrested in connection with a particular crime. However, one of the photographs was of someone unconnected with the crime. The court nonetheless applied theRestatement (Second) of Torts, § 611, privilege on the ground that what the newspapers had published was "in effect a report of an informal governmental report" concerning the arrest. Id.
at 416.
Wilson argues that the Alabama privilege should not apply to the news report at issue because the actions of the Birmingham Police Department "can hardly be considered an investigation." This contention is incorrect. The weight of authority makes it clear that the Birmingham Police Department's interview of the Cuban refugees did constitute an investigation. The police incident report subsequently filed by Officer Morgado confirms the existence of an investigation, and the Post-Herald news report accurately reflects the contents of that investigation.
In short, the news report at issue is conditionally privileged because it accurately reports statements made by the Cuban refugees during an official police investigation, as reflected in the official police incident report. See Edwardsv. National Audubon Society, Inc., 556 F.2d 113 (2d Cir.),cert. denied, 434 U.S. 1002, 98 S.Ct. 647, *Page 1213 54 L.Ed.2d 498 (1977); Time, Inc. v. Pape, 401 U.S. 279,91 S.Ct. 633, 28 L.Ed.2d 45 (1971); Greenbelt Cooperative PublishingAssociation v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6
(1970). Although these cases were decided under the "neutral reportage" doctrine arising from the First Amendment itself, these cases, like § 13A-11-161, stand for the proposition that substantially accurate reports of official investigations are privileged. The court in Medico v. Time, Inc., supra, recognized both the state privilege modeled on Restatement(Second) of Torts, § 611, and the privilege afforded under the doctrine of neutral reportage. In finding a privilege for the publication of a summary of Federal Bureau of Investigation documents, which identified the plaintiff as a member of an organized crime "family," the Third Circuit explained that courts have, "as a matter of federal law, expressed reluctance to hold the press responsible for publication of defamatory statements originally uttered by others." 643 F.2d at 145.
It is undisputed in the instant case that the Post-Herald news report at issue constitutes a fair and accurate report of the statements made by two Cuban refugees to the Birmingham Police Department in the course of an official investigation and summarized in the official police incident report. Biele was present during the interrogation. According to the sworn affidavits of two police officers present, the news report at issue accurately reflects the investigation and the police incident report. There is no suggestion in the evidence to the contrary. The news report, therefore, is conditionally privileged under § 13A-11-161 and the common law.
It is conceded by all parties that Wilson is a private person, as opposed to a public figure, within the meaning ofGertz v. Robert Welch, Inc., 418 U.S. 323, 345, 94 S.Ct. 2997,3009, 41 L.Ed.2d 789 (1974), cert. denied, 459 U.S. 1226,103 S.Ct. 1233, 75 L.Ed.2d 467 (1983). Section 13A-11-161 provides that the publication is privileged "unless it be proved that the same was published with actual malice." Actual malice as used in this statute refers to the common law standard of malice rather than the constitutional standard of malice as set out in New York Times Co. v. Sullivan, 376 U.S. 254,84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In Alabama, where a communication concerning a private person is protected by a qualified or conditional privilege, such a person cannot recover in a defamation action unless that person can show that the communication was made with actual or common law malice (shown by evidence of previous ill will, hostility, threats, other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of the defendant's language, the mode and extent of the publication, and the like). Mead Corp. v. Hicks, 448 So.2d 308 (Ala. 1983); Fultonv. Advertiser Co., 388 So.2d 533 (Ala. 1980), cert. denied,449 U.S. 1125, 101 S.Ct. 942, 67 L.Ed.2d 111 (1981); Kenney v.Gurley, 208 Ala. 623, 95 So. 34 (1923).
There is not a scintilla of actual or common law malice in this case. There is not a scintilla of evidence that defendants, McEachran and Biele, who acted in their capacities as professional journalists in publishing the news report, either knew Wilson or knew of him prior to the police interview which led to the news report at issue. Therefore, there was no evidence of any previous ill will, hostility, threats, other actions, or former libels or slanders by any of these defendants toward Wilson. There is not a scintilla of evidence that any violent language was used by the defendants.
The allegedly false and defamatory statements of which Wilson complains are all based on and corroborated by statements made during the official police investigation undertaken in the presence of reporter Biele and reflected in the subsequent police incident report. The news report at issue does not purport to decide whether the allegations made by the Torreses are accurate; it purports simply to relate, fairly *Page 1214 
and accurately, the information provided by the Cubans to the police. The headline reads, "Cuban refugee couple tells ofmistreatment by Alabama sponsor." A caption under the picture of the Torreses indicated their allegations were made "while being questioned at City Hall." In the newspaper article, the phrases "Torres said," "he [Torres] said," or "Torreses said" appear eight times, and the phrase "as they told their story" appears one time in the relatively short article. That article was published once. One other article concerning the story was published after Wilson demanded a retraction. The second article also told Wilson's side of the story.
The fact that the defendants did not hold the story until Wilson could be contacted and could respond is not, in and of itself, evidence of actual malice. The Cuban refugee problem was newsworthy. A Cuban refugee couple arrived in Birmingham. The Birmingham Police Department found a new sponsor for them. A Birmingham motel, whose name and address are reported in the article, provided free accommodations for them. The article reported that the Torreses were not communists and were given the worst jobs in Cuba and that they had come to the United States to make a decent living. The article told of Mrs. Torres's crying at the mention of the five children they had left in Cuba.
The Torreses were in Birmingham and they were in need. They had been helped by the police and by a commercial establishment. This was reported. An opportunity was presented to the people and businesses of Birmingham to help Cuban refugees in their midst. This was newsworthy. This made the story timely.
The judgment of the trial court is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.