BEATTY, Justice.
This is an appeal by plaintiff, Rozanne T. Yates, from summary judgment granted in favor of defendants, Patt B. Grethmann, d/b/a Country Emporium, and Alan W. Rodgers. We reverse and remand.
On February 27, 1986, Yates placed several items on consignment with Patt Greth-mann at the Country Emporium, including an antique oil painting of a madonna. Because her own informal appraisal had led Yates to believe the painting was worth $1,000, she agreed with Grethmann to sell the painting at a minimum of $1,000. Grethmann was to receive a 25 percent commission from the sale of the painting.
On August 20, 1986, Yates says, she received an anonymous telephone call from a person claiming personal knowledge that Grethmann and another individual, defendant Alan Rodgers, had discovered that the painting could be worth $200,000; Yates says the caller also told her that a conspiracy existed between the defendants to remove the painting from the premises of the Country Emporium for examination, photographing, and/or testing to determine the true value of the painting, and that if she attempted to terminate the consignment *1318 agreement, she would be told that the painting had just been sold to Rodgers and she would be shown a credit card charge slip for the amount of the purchase price.
Yates alleges that on August 21, 1986, she went to the Country Emporium to see the painting; that she was told by Greth-mann that Rodgers had purchased the painting the previous day and had taken the painting to Nashville to get his wife's approval of the purchase and also was told that Rodgers had called and wanted to finalize the sale; that she was shown a blank credit card charge slip that had not been deposited, was not signed or dated, and had no amount of purchase or description of the merchandise; and that she left the Country Emporium and called the clearance service of the charge card company and learned that Rodgers’s credit line would not allow a $1,000 purchase.
Yates brought this action, alleging breach of contract, conversion, fraud, and breach of a resulting trust, and demanding damages and/or injunctive relief. Greth-mann then tendered Yates a check for $750, which was declined. Following the entry of a temporary restraining order enjoining the parties from “concealing, selling, conveying, transferring, removing from the State of Alabama, or otherwise disposing of the antique oil painting,” the defendants answered, denying the claims. Yates filed a response to the motion accompanied by two sworn statements. Upon consideration, the trial court granted summary judgment to the defendants.
A party moving for summary judgment has the burden of establishing the absence of a genuine issue of material fact. Jones v. Newton, 454 So.2d 1345, 1348 (Ala.1984). To meet such a burden, the moving party must show that there is not so much as the “merest gleam, glimmer, spark, [or the] least particle or smallest trace” of evidence in support of the theory of the nonmoving party. If there is such a “scintilla” of evidence, the trial court must allow factual questions to go to the jury. Griffin v. Little, 451 So.2d 284, 187 (Ala.1984).
Although the scintilla rule was abolished in Alabama as of June 11, 1987 (1987 Ala. Acts, Act No. 87-184), it is applicable to this case because the complaint was filed prior to that date.
It has also been stated that:
“The scintilla rule requires the court to admit the truthfulness of all evidence favorable to the plaintiff and thereby to remove all issues of credibility from the case and then determine if there are facts from which the trier of facts could reasonably and logically infer the ultimate facts upon which the claim depends; if so, the case must be decided by the trier of facts.”
Wilson v. Birmingham Post Co., 482 So.2d 1209, 1211 (Ala.1986).
Applying these standards to the case at bar, we conclude that summary judgment was erroneous. Yates does not merely rely on her own deposition as the basis of her claims, as defendants contend, but also has the sworn statements of two witnesses, Stephanie Sams and Carol Sullivan, both of whom worked in Grethmann’s shop and personally witnessed the occurrences giving rise to the alleged conspiracy upon which Yates’s claims are based.
The facts set forth in the depositions of Sams and Sullivan offered by plaintiff provide more than a scintilla of evidence to support plaintiff’s claims. Both depositions indicate that, approximately five to six months before this suit was filed, Rodgers began coming into the Country Emporium about every two weeks and that after the first several visits, defendants would remove Yates’s painting from the wall and take it into a back room, where Rodgers would apparently conduct tests on the painting. Both Sams and Sullivan deposed that Grethmann considered the painting to be valuable and hoped to gain monetarily from its sale. In her deposition, Sams testified:
“I was made aware that if the painting was of value that Patt Grethmann and Alan Rodgers were going to purchase it. And if it wasn’t, then they weren’t going to purchase it.
“... She [Grethmann] made the statement that if things went as she was *1319 hoping that it would make her very wealthy.”
In addition, Sullivan deposed:
“Well, they were going to definitely sell the painting. And she talked many hours about her future plans, what she was going to do with all her hundreds of thousands of dollars she was going to make off the painting.”
Sullivan added that Grethmann stated to her that the frame alone was worth $3,000. Both Sams and Sullivan stated that Greth-mann made it clear that if, but only if, the painting was valuable, defendants would purchase the painting from Yates for $1,000. Sams stated further:
“It became common knowledge before I left that if the painting was valuable, Patt [Grethmann] and Alan [Rodgers] together were going to purchase it. If it was not valuable, it was going to remain Rozanne [Yates’s].”
According to both depositions, Sams and Sullivan were instructed that the painting was not to be sold until the value was determined; that if Yates inquired about the art work, Grethmann was to be summoned immediately; and that Yates was not to be told about the apparent authenticity and potential value of the painting. Sullivan further deposed as follows:
“Q. Did you become aware at some point in time that Patt [Grethmann] was not telling or disclosing to Rozanne Yates the information that she had obtained about the frame being worth two or three thousand dollars and about the great potential value of the oil painting itself?
“A. No, sir, she was not letting Ro-zanne know any of that information.
“Q. How do you know she was not?
“A. Because she told me she was not.
“A. We were not to discuss it with Rozanne. We were told that Patt would handle everything. In other words, if she comes in, just tell her that we don’t know anything and wait for her to come back.
“Q. Did Patt Grethmann tell you what her plan was or how she intended to deal with Rozanne if Rozanne came in and asked about the painting?
“A. Yes, sir. She told me that she had — when I asked if she had purchased the painting from Rozanne, she told me no, that they weren't going to purchase it until they found out the value of it, but that she had gotten a credit card — -this was probably two weeks after they started investigating the picture — had gotten a credit card run off and had it in her file—
“Q. In other words, they impressed a credit card bill?
“A. Right, but it was not filled in or signed.
“Q. All right. And what were they going to do — what did she tell you they were going to do if Rozanne came in and asked if the painting had sold or if she could have it back or whatever?
“A. She said that she would just simply tell her that they had sold it the day before and that he had filled out that credit card and that he had it at his house on approval, to just simply — and, you know, if he didn’t want it, he was going to bring it back.
“Q. What were they going to do if it turned out, when they ultimately got it tested — if it was discovered that it wasn’t of any particular value?
“A. They were going to put it back on the wall, with the price sticker of $1,000 on it.
"Q. And tear up the charge slip?
“A. Exactly.”
Yates says that when she did come into the store and request her painting, Grethmann told her exactly what the anonymous caller had said she would tell her, which was exactly what Sams and Sullivan stated she was to be told.
According to Sullivan, the painting was taken from the shop to the home of Greth-mann’s mother before the lawsuit was filed. When the complaint was served, Grethmann contacted a lawyer, and, as Grethmann related to Sullivan, told him that the painting was in Nashville. After leaving the attorney’s office, Grethmann *1320 told Sullivan that she retrieved the painting from her mother’s home and immediately took it to Nashville, a violation of the court’s temporary restraining order.
The evidence adduced was clearly sufficient to create genuine issues of material fact. See Rule 56(c), A.R.Civ.P. Thus, the summary judgment was erroneous. For that reason, the judgment must be, and it hereby is, reversed, and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, ALMON and HOUSTON, JJ., concur.