MOORE, Judge,
concurring in part and dissenting in part.
I concur in the decision to grant the application for rehearing as to the propriety of the summary judgment entered on the libel claim filed by Benjamin L. Little against Consolidated Publishing Company (“CPC”) and Megan Nichols. I also concur to affirm the trial court’s summary judgment as to Little’s tort-of-outrage claim; however, I dissent from the decision to affirm the summary judgment on Little’s libel claim.
In order for a public figure, like Little, see Mobile Press Register, Inc. v. Faulkner, 372 So.2d 1282 (Ala.1979), to recover compensatory or punitive damages for libel, that public figure must prove that the defendant, with “constitutional malice,” published to another written or printed material containing a false and defamatory *531 statement concerning the public figure, which is either actionable without having to prove special harm (per se) or actionable upon proof of special harm (per quod). See Ex parte Crawford Broad. Co., 904 So.2d 221, 225 (Ala.2004). In this case, CPC and Nichols moved for a summary judgment on the grounds that the statements upon which Little predicated his libel claim were not false or defamatory, that they enjoy qualified immunity from liability for publishing those statements, and that the statements were not published with constitutional malice. On appeal, Little challenges each of those grounds as being insufficient, either factually or legally, to support the summary judgment entered by the trial court.
1. The “Truth” Argument
In his complaint, Little alleged that CPC and Nichols libeled him in the February 19, 2009, story in The Anniston Star by stating: “[John] Spain also said there is a buzz in the city that Little had or has a personal relationship with [Yolanda] Jackson[, the person hired by the Anniston city council to conduct an audit of the city’s human-resources practices,] and that is why [Little] pushed her for hiring last year.” Little further essentially alleged that CPC and Nichols reiterated those assertions in the editorial published on February 20, 2009, in which Bob Davis, after referring to “Little’s sweetheart HR audit deal,” wrote: “At Little’s urging, Anniston paid Yolanda Jackson of Uniontown $2,500 to examine the city’s human resources practices.”[5] CPC and Nichols asserted in their summary-judgment motion that all the allegedly offensive statements were “substantially true.” See 1 Alabama Pattern Jury Instructions: Civil 23.04 (2d ed. Supp.2009) (“In determining whether the statement was true or false, you must not consider whether the statement was absolutely and in all respects accurate, but rather whether the statement was substantially accurate and accurate in all material respects with regard to the plaintiff.”).
Because the published statements involved a public figure and involved a matter of public concern, Little is not entitled to any presumption that the statements published by CPC and Nichols were false. See Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776-77, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). The freedom of speech guaranteed by the First Amendment of the United States Constitution places the burden of proving falsity at trial squarely on a public-figure plaintiff claiming injury to his or her reputation as the result of statements that involved matters of public concern and were published by a media defendant. Id. at 775-76. Thus, in this case, Little would bear the burden at trial of proving that CPC and Nichols published false statements regarding his relationship with Jackson and the impact that relationship had on his decision to recommend her hiring to the Anniston city council. In the context of a summary-judgment motion,
“ ‘[i]f the burden of proof at trial is on the nonmovant, the movant may satisfy the Rule 56[, Ala. R. Civ. P.,] burden of production either by submitting affirmative evidence that negates an essential element in the nonmovant’s claim or, assuming discovery has been completed, by demonstrating to the trial court that *532 the nonmovant’s evidence is insufficient to establish an essential element of the nonmovant’s claim
Ex parte General Motors Corp., 769 So.2d 903, 909 (Ala.1999) (quoting Berner v. Caldwell, 543 So.2d 686, 691 (Ala.1989) (Houston, J., concurring specially)). Hence, at this stage of the proceeding, CPC and Nichols bore the burden of proving either that the alleged defamatory statements were not false or that Little could not prove their falsity with substantial evidence. See Rule 56, Ala. R. Civ. P.
In their summary-judgment motion, CPC and Nichols initially argued that they had negated an essential element of Little’s claim by proving that they accurately quoted Spain. Basically, CPC and Nichols maintain, as asserted in the February 26 “correction” printed in the “For the Records” article, that they did not publish a story stating that Little and Jackson actually had engaged in a personal relationship or that, based on that relationship, Little had, in fact, pushed for Jackson to be retained for the audit. They contend that they published a story that reported only that Spain had said that there was a rumor to that effect circulating around Anniston. They contend that, because they accurately quoted Spain, along with Little’s denial of the rumor, they truthfully reported the events occurring during and after the February city-council meeting.[6] The trial court noted that, regardless of the falsity of the rumor, Little had failed to prove that there was not a rumor floating around Anniston as described by Spain to Nichols. CPC and Nichols argue that, without such evidence, they cannot be liable for merely circulating Spain’s statements.
In WKRG-TV, Inc. v. Wiley, 495 So.2d 617 (Ala.1986), a media defendant made the identical argument that CPC and Nichols make — that “the publisher is making a ‘true’ statement of the events of the meeting, regardless of the truth or falsity of the statements made in the meeting.” 495 So.2d at 619. Our supreme court rejected that argument, holding that, under Alabama law, when the media reports a defamatory statement made by a third party, the repetition of that defamatory statement is considered a separate and actionable publication. 495 So.2d at 619. Hence, when determining truthfulness, the key inquiry is not whether the reporter fairly and accurately quoted or summarized the statement of the third party, but whether that statement is substantially true.
I find the holding in Wiley to be consistent with the following statements of the common law of defamation.
“The fact that the publication of the scandalous matter purports to be based on rumor is no defense. Publication of libelous matter, although purporting to be spoken by a third person, does not *533 protect the publisher, who is liable for what he publishes. Stephens v. Commercial News Co., 164 Ill.App. 6 [ (1911) ]; Cooper v. Lawrence, 204 Ill.App. 261-270 [ (1917) ]; O’Malley v. Illinois Publishing & Printing Co., 194 Ill.App. 544 [ (1915) ]. Very pertinent to this point is the comment in Newell on Slander and Libel, 4th Ed., § 800. ‘A man cannot say there is a story in circulation that A. poisoned his wife or B. picks C.’s pocket in the omnibus, or that D. has committed adultery, and relate the story, and when called upon to answer say: “There was such a story in circulation; I but repeated what I heard, and had no design to circulate it or confirm it”; and for two very plain reasons: (1) The repetition of the story must in the nature of things give it currency; and (2) the repetition without the expression of disbelief will confirm it. The danger — an obvious one — is that bad men may give currency to slanderous reports, and then find in that currency their own protection from the just consequences of a repetition.’ ”
Cobbs v. Chicago Defender, 308 Ill.App. 55, 31 N.E.2d 323, 325 (1941). See also Davis v. Macon Tel. Publ’g Co., 93 Ga.App. 633, 639-40, 92 S.E.2d 619, 625 (1956) (“The fact that the charges made were based upon hearsay in no manner relieves the defendant of liability. Charges based upon hearsay are the equivalent in law to direct charges.”).
In Martin v. Wilson Publishing Co., 497 A.2d 322 (R.I.1985), a newspaper published an article about a local real-estate developer in which the newspaper scolded local residents for spreading a rumor that the developer had caused or profited from a rash of arsons in areas he was developing. The developer sued the newspaper publisher arguing that
“the newspaper essentially reported the existence ... of false, defamatory rumors circulating about town connecting [the developer] with a rash of incendiary fires, despite the fact that the newspaper had no belief in the underlying truth of such rumors.”
497 A.2d at 325. The lower court instructed the jury that the burden was on the developer to prove that no such rumors existed. “In essence, the trial justice ruled as a matter of law that if such rumors were current at or before the time of publication, the newspaper could republish such rumors with impunity.” 497 A.2d at 327. The Supreme Court of Rhode Island disagreed with that proposition of law, stating:
“It has long been recognized in respect to the law of defamation that one who republishes libelous or slanderous material is subject to liability just as if he had published it originally. Cianci v. New Times Publishing Co., 639 F.2d 54, 60-61 (2d Cir.1980); Metcalf v. The Times Publishing Co., 20 R.I. 674, 678, 40 A. 864, 865 (1898); Folwell v. Providence Journal Co., 19 R.I. 551, 553-54, 37 A. 6, 6 (1896); Rice v. Cottrel, 5 R.I. 340, 342 (1858); 3 Restatement (Second) Torts § 578 (1977); Prosser and Keeton, Torts § 113 at 799 (5th ed.1984).
“A good statement of this rule is set forth in Olinger v. American Savings and Loan Association, 409 F.2d 142, 144 (D.C.Cir.1969):
“‘The law affords no protection to those who couch their libel in the form of reports or repetition.... [T]he repeater cannot defend on the ground of truth simply by proving that the source named did, in fact, utter the statement.’
“The republication rule applies to the press as it does to others. Cianci, 639 F.2d at 61.
*534 [[Image here]]
“Consequently, the appropriate inquiry to be submitted to the triers of fact in the instant case was not whether such rumors existed but whether the rumors were based upon fact or whether they were false.... ”
497 A.2d at 327. Thus, even in a case in which the newspaper decried the rumor, it could not avoid liability on the basis that it was merely reporting its existence. See also Bishop v. Journal Newspaper Co., 168 Mass. 327, 332, 47 N.E. 119, 121 (1897) (imposing liability for libel on publisher even though it included information contradicting rumor in story); accord Restatement (Second) of Torts § 548 comment e (1976).[7]
Based on the foregoing authorities, a newspaper reporter or publisher cannot avoid liability for publishing a false and defamatory statement on the ground that the newspaper reporter or publisher accurately quoted the rumormonger, even if the newspaper story clearly identified the statement as an unverified report and even if the newspaper story contains a denial of the rumor by its subject. See Connaughton v. Harte Hanks Commc’ns, Inc., 842 F.2d 825, 837 n. 6 (6th Cir.1988), aff'd, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (“[I]t is clear that 'mere publication of a denial by the defamed subject does not absolve a defendant from liability for publishing knowing or reckless falsehoods.’ ” (quoting Tavoulareas v. Piro, 759 F.2d 90, 133 (D.C.Cir.1985))). Hence, by proving that they accurately reported Spain’s statements, CPC and Nichols did not negate Little’s claim that the rumors circulating about him and Jackson were false.
CPC and Nichols next argue that Little “admitted that he had some type of a ‘relationship’ as suggested in the subject publications.” The evidence in the record is clear, however, that Little did not admit to any personal relationship with Jackson. Little actually denied the existence of such a relationship both in his interview with Nichols and in his deposition testimony. Little testified that he had never even heard of Jackson before Phillip White, then the mayor of Uniontown, recommended her as a human-resources consultant. Thereafter, Little met with Jackson several times, dined with Jackson on two occasions, once with Mayor White in attendance, and talked with her over the telephone on four or five occasions. CPC and Nichols did not present any evidence indicating that Little and Jackson discussed anything other than the official business for which Jackson was ultimately engaged. The record certainly does not indicate that Little engaged in a “personal relationship” as opposed to a business relationship with Jackson. Hence, I reject the factual argument that Little admitted to a personal relationship, either expressly or impliedly, and I conclude that CPC and Nichols did not produce any evidence indicating that Little and Jackson did, in fact, engage in a personal relationship of any kind that would be sufficient to warrant the imposition of a summary judgment.
CPC and Nichols additionally argue that “[Little] cannot meet his burden of proof *535 in this case, and his claims fail as a matter of law.” Assuming that that language advances an argument that Little cannot produce substantial evidence indicating that the alleged defamatory statements were false, I reject that contention. Little presented uncontradicted evidence indicating that he did not have a personal relationship with Jackson. Little also presented evidence indicating that he did not recommend the hiring of Jackson on the basis of any such personal relationship. Little testified that he had recommended Jackson solely on the basis of his conversations with Mayor White and the perceived need for Jackson’s consulting services. CPC and Nichols admitted that Little did not, as the headline to the February 19 story alleged, order the human-resources audit. Thus, assuming that the burden of production had shifted to Little to present substantial evidence indicating that the alleged defamatory statements were false, Little carried that burden.
A summary judgment would be appropriate in this case if the evidence showed indisputably that the rumor about Little that was repeated in The Anniston Star was substantially true or if Little could not present substantial evidence of its falsity. However, the record shows, without dispute, that Little did not have a personal relationship with Jackson, that he did not order the audit, and that he did not recommend Jackson based on any alleged personal relationship. Hence, CPC and Nichols were not entitled to a summary judgment based on their “truth” argument.
2. The “Defamato'ry Meaning” Argument
CPC and Nichols next argue in support of the summary judgment that the statement that Little had a “personal relationship” with Jackson is not reasonably capable of defamatory meaning. “Generally, any false and malicious publication, when expressed in printing or writing, or by signs or pictures, is a libel [if it] charges an offense punishable by indictment! ] or ... tends to bring an individual into public hatred, contempt, or ridicule, or charges an act odious and disgraceful in society.” McGraw v. Thomason, 265 Ala. 635, 639, 93 So.2d 741, 744 (1957). “The test to be applied in determining whether a newspaper article makes a defamatory imputation is whether an ordinary reader or a reader of average intelligence, reading the article as a whole, would ascribe a defamatory meaning to the language.” Drill Parts & Serv. Co. v. Joy Mfg. Co., 619 So.2d 1280, 1289 (Ala.1993) (citing Loveless v. Graddick, 295 Ala. 142, 148, 325 So.2d 137, 142 (1975)). “The question of ‘[w]hether the communication is reasonably capable of a defamatory meaning is a question, in the first instance, for the court,’ and ‘if the communication is not reasonably capable of a defamatory meaning, there is no issue of fact, and summary judgment is proper.’ ” Drill Parts & Serv. Co., 619 So.2d at 1289-90 (quoting Harris v. School Annual Publ’g Co., 466 So.2d 963, 964-65 (Ala.1985)).
Taken in isolation, the term “personal relationship” does not necessarily carry with it any pejorative connotation. However, Nichols stated that she used that term after receiving information from Spain that led her to believe that Little and Jackson had a dating relationship. Davis placed that phrase “in greater context” in the February 19 story by referring to Little as being unmarried, thereby, at least arguably, implying the relationship was romantic in nature. The February 20 editorial furthered that notion by referring to the audit as “Little’s sweetheart” deal, because that term had no other obvious meaning considering no one had alleged Little had gained any pecuniary advantage *536 from the audit. See Hale v. Kroger Ltd. P’ship I, 28 So.3d 772, 776 (Ala.Civ.App.2009) (holding that, in ruling on a summary-judgment motion, record evidence must be viewed in a light most favorable to nonmovant). When coupled with the statements that Little had “ordered” the audit and that the audit had produced nothing of value for the $2,500 spent, the entirety of the statements implies that Little used his office to benefit his romantic interests at the expense of the City of Anniston.
In Wiley, supra, the supreme court held that false statements that implied that a public official was misusing his office for his own personal gain were defamatory. 495 So.2d at 619. In Gray v. WALA-TV, 384 So.2d 1062 (Ala.1980), overruled on other grounds, Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085 (Ala.1988), the supreme court held that statements implying that a public contractor had “corruptly and illegally obtained, through political connections, a contract with the city and had not performed under the contract although having been paid to do so, and thereby dishonestly obtained public funds,” were libelous per se. 384 So.2d at 1065. See also Wofford v. Meeks, 129 Ala. 349, 357, 30 So. 625, 628 (1901) (holding that false statements impugning honesty of county commissioners in transacting public business were libelous per se); Advertiser Co. v. Jones, 169 Ala. 196, 204-05, 53 So. 759, 762 (1910) (newspaper article improperly asserting that city official had used city labor to advance his personal business interests held defamatory). Other jurisdictions likewise hold that statements accusing a public official of self-dealing or otherwise abusing the privileges of public office are defamatory in nature. See Annotation, Libel and Slander: Actionability of Statement Imputing Incapacity, Inefficiency, Misconduct, Fraud, Dishonesty, or the Like to Public Officer or Employee, 53 A.L.R.2d 8 (1957). The caselaw from other jurisdictions suggests that the statements implying that Little had used his public office to advance his personal relationship with Jackson at the cost of the City of Anniston, and without the City of Anniston receiving anything of value in return, would be considered defamatory.
In moving for a summary judgment, CPC and Nichols argued solely that the term “personal relationship,” when considered in isolation, did not carry an actionable defamatory meaning. CPC and Nichols did not argue that the term “personal relationship,” when used in the context applicable here, could not be considered defamatory in nature. That argument, of course, would have been rejected. Given the context in which the term was used in this case, CPC and Nichols are not entitled to a summary judgment on the basis that the term “personal relationship” is incapable of a defamatory meaning.
3. “Qualified Privilege” and “Constitutional Malice” Arguments
In their motion for a summary judgment, CPC and Nichols asserted that they had a qualified privilege to publish the rumor about Little, pursuant to Restatement (Second) of Torts § 611 (1977),[8] which provides, in pertinent part:
*537 “The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.”
In Wilson v. Birmingham Post Co., 482 So.2d 1209 (Ala.1986), the supreme court appeared to have adopted § 611 of the Restatement (Second) of Torts in whole, but, in Wiley, supra, the court held that Alabama law had embraced only a limited form of § 611 that “would correspond at most to the ‘official action or proceeding’ portion of the rule.” 495 So.2d at 618. That portion of the rule to which Wiley refers is embodied in § 13A-11-161, Ala. Code 1975, which provides, in pertinent part:
“The publication of a fair and impartial report ... of any investigation made by any ... public body or officer, shall be privileged, unless it be proved that the same was published with actual malice.... ”
It appears from the supreme court’s comments in Wiley that Alabama recognizes that a party has a qualified privilege to repeat defamatory statements uttered at a public investigatory meeting so long as the publication is fair, impartial, and repeated without “actual malice.”
In their summary-judgment motion, CPC and Nichols argued that, because Spain made the statements at a public meeting about a matter of public concern and because they fairly reported those statements, the publication of those statements is qualifiedly privileged under § 611 of the Restatement (Second) of Torts. The evidence indicates that the statements attributed to Spain and of which Little complains were not made in the course of a public meeting, but in an interview following the conclusion of a public meeting; however, Little does not argue that point as a basis for avoiding the summary judgment. Little also does not argue that CPC and Nichols failed to fairly report the substance of the statements made by Spain. Little argues solely that the motion for a summary judgment should not have been granted because, he says, he presented sufficient evidence that CPC and Nichols acted with the requisite malice when repeating the rumor.
In that regard, I note that § 13A-11-161 states that “actual malice” must be shown. However, that state law is preempted by federal law, which provides that, when a plaintiff in a libel action is a public official and the alleged defamatory statement relates to his or her conduct as a public official, the plaintiff must establish “constitutional malice” by clear and convincing evidence. Gary v. Crouch, 923 So.2d 1130, 1138 (Ala.Civ.App.2005) (citing Wiggins v. Mallard, 905 So.2d 776 (Ala.2004); and Smith v. Huntsville Times Co., 888 So.2d 492 (Ala.2004)). “Constitutional malice” refers to the standard set forth in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). “This standard is satisfied by proof that a false statement was made “‘with knowledge that it was false or with reckless *538 disregard of whether it was false or not.” ’ ” Smith v. Huntsville Times Co., 888 So.2d 492, 499 (Ala.2004) (quoting Harte-Hanks Commc’ns, Inc. v. Connaughton, 491 U.S. 657, 659, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989), quoting in turn New York Times v. Sullivan, 376 U.S. at 279-80, 84 S.Ct. 710).
“When determining if a genuine factual issue as to [constitutional] malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under New York Times [Co. v. Sullivan, 376 U.S. 254 (1984) ]. For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find [constitutional] malice by clear and convincing evidence.”
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making the determination whether the public figure has produced evidence of a sufficient “caliber or quantity to allow a rational finder of fact to find [constitutional] malice by clear and convincing evidence,” id., the court must believe the evidence submitted by the public figure and all justifiable inferences must be drawn in his or her favor. 477 U.S. at 255.
Making all justifiable inferences in favor of Little, the evidence shows that Little never engaged in a personal relationship with Jackson. At some point, Little recommended to the city council that Jackson perform the human-resources audit. Little did not advocate for the hiring of Jackson in order to advance his nonexistent personal relationship with her. Little did not “order” the audit; rather, the city council, after hearing from Jackson and Mayor White at a public meeting, voted unanimously to retain Jackson to perform the audit. Nichols was aware of the manner of Jackson’s hiring based on her attendance at that city-council meeting. In a February 2009 city-council meeting, Spain, a known political opponent of Little, indicated that the audit was worthless and that he intended to investigate the matter. Following that meeting, Spain, in an interview with Nichols, informed Nichols that there was a “buzz” around Anniston that Little had urged the city council to retain Jackson because of his personal relationship with Jackson.
At no time did Nichols or CPC know for a fact that the rumor was false. Nichols interviewed Little, who denied the truth of the rumor. Nichols and Davis both testified that they had no reason to doubt that denial. Nichols attempted to contact Jackson for about a week following her interview with Spain, but to no avail. Neither Nichols nor any other CPC employee followed up with Spain or anyone else to identify the source of the rumor or to take any other steps to ascertain whether, in fact, the rumor existed or whether the rumor had any basis in fact. Nichols drafted the story, accurately quoting both Spain and Little. Davis added “context” to the story by noting that Little was unmarried. An unknown copy editor drafted the headline for the February 19 story that contained the false statement that Little had “ordered” the audit. CPC then published the story, with the inaccurate headline, on the front page of the February 19 edition of The Anniston Star. CPC later attempted to correct the erroneous headline and to clarify that it was not alleging that the rumor was accurate, but it did not place that “retraction” on the front page of the newspaper as Little’s attorney had demanded.
Based on the foregoing evidence, I agree that Little did not present sufficiently *539 clear and convincing evidence indicating that CPC and Nichols published the rumor with knowledge of its falsity. The record contains no evidence indicating that, at the time the story was published, Nichols or anyone else employed by CPC subjectively knew that Little did not have a personal relationship with Jackson and that Little had not recommended Jackson to perform the audit based on that personal relationship. Nichols knew that Little had not “ordered” the audit, a fact that will be discussed in more detail later in this writing, but that knowledge does not equate to subjective knowledge of the falsity of the rumor.
I now turn to the question whether CPC and Nichols recklessly disregarded the truth of the rumor. “A defendant acts with ‘reckless disregard’ if, at the time of publication, the defendant ‘ “entertained serious doubts as to the truth of [its] publication” or acted “with a high degree of awareness of ... [its] probable falsity.” ’ ” Smith v. Huntsville Times Co., 888 So.2d at 499 (quoting McFarlane v. Sheridan Square Press, Inc., 91 F.3d 1501, 1508 (D.C.Cir.1996), quoting in turn St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)); see also Finebaum v. Coulter, 854 So.2d 1120, 1124 (Ala.2003) (citing St. Amant, 390 U.S. at 731). “ ‘The [constitutional] malice standard is subjective; the plaintiff must prove that the defendant actually entertained a serious doubt.’ ” Smith, 888 So.2d at 499-500 (quoting McFarlane, 91 F.3d at 1508).
In her affidavit, Nichols attested that she had no serious doubts about the accuracy of her story. However, it is clear from her deposition testimony that Nichols was attesting only that she was accurately quoting Spain and Little. Nichols did not testify that she had no serious doubts about the validity of the rumor. To the contrary, Nichols and Davis, the CPC editor, both testified that they had no reason to doubt Little’s denial. A jury could reasonably find that Nichols and CPC could not be both certain that Little’s denial was true and also believe, without any serious doubts, that the rumor was true. Hence, a jury could be clearly convinced that Nichols and CPC subjectively entertained serious doubts about the veracity of the rumor before publishing it.
Moreover, the record contains some evidence indicating that CPC actively embellished the rumor. By their own admissions, both CPC and Nichols acknowledge that the headline stating that Little “ordered” the audit does not accurately portray the facts surrounding Jackson’s hiring. The story itself states that “the City” hired Jackson to perform the audit, not that Little “ordered” the audit. In quoting Spain, Nichols did not obtain any information indicating that Little had directed that the city council hire Jackson to conduct the audit. It appears that an unknown copy editor employed by CPC who drafted the headline fabricated that Little had “ordered” the audit. The evidence shows that CPC did not publish any story without editorial review, so a jury could infer that an editor employed by CPC approved the headline although it did not accurately summarize the story that followed.
The headline does not so much report the rumor as it does supplement it with additional false information conveying that Little had the authority to “order” the audit. When considered in conjunction with the claims that Little had a personal relationship with Jackson and that the audit was deemed worthless by several Anni-ston officials, the headline gave additional gravity to the implication that Little was abusing his position as a city councilman. A jury could at least infer that the head *540 line, by overstating Little’s role in Jackson’s hiring, was intended to lend greater credence to a rumor that Little was misusing his authority as a city councilman, which CPC and Nichols did not know to be true. Cf. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (“[A] deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of [determining constitutional malice] unless the alteration results in a material change in the meaning conveyed by the statement.” (emphasis added)).
In Wiley, supra, the supreme court suggested that constitutional malice may be inferred if a reporter actively encourages the spreading of a defamatory statement. In that case, a reporter covering a neighborhood meeting' regarding a proposed landfill asked a citizen to repeat a rumor on camera that two county commissioners had a personal financial stake in a corporation that would benefit from their approval of the landfill site. 495 So.2d at 619-21. The supreme court noted that that evidence indicated that the reporter had acted with constitutional malice in reporting the rumor, although the court found “[e]ven more significant” other evidence that another reporter had determined the falsity of the rumor before the report was made. 495 So.2d at 621. In this case, the headline did not merely repeat the rumor, it expanded on it, actually contributing additional, inaccurate, facts to the rumor. Under Wiley, that contribution cannot be discounted.[9]
In holding that certain fact issues prevent this court from affirming the summary judgment entered by the trial court, I do not mean to be understood as stating that the mere publication of a rumor implies constitutional malice. See Howard v. Antilla, 294 F.3d 244, 252-53 (1st Cir.2002) (publication of rumor that company chairman was a convicted felon using a false alias held insufficient to establish constitutional malice). I also do not mean to be understood as stating that the publication of a rumor despite a denial by its subject constitutes constitutional malice. See Smith, 888 So.2d at 501 (noting that “ ‘ “such denials are so commonplace in the world of polemical charge and counter-charge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error” ’ ” (quoting Connaughton, 491 U.S. at 691 n.37, quoting in turn Edwards, 556 F.2d at 121)). Additionally, my writing should not be understood as stating that the failure of Nichols and CPC to more thoroughly investigate the veracity of the rumor indicates that they acted with constitutional malice. Smith, 888 So.2d at 500 (“Indeed, the failure to investigate does not constitute malice, unless the failure evidences ‘ “purposeful avoidance,” ’ that is, ‘an intent to avoid the truth.’ ” (quoting Sweeney v. Prisoners’ Legal Servs., 84 N.Y.2d 786, 793, 647 N.E.2d 101, 104, 622 N.Y.S.2d 896, 899 (1995), quoting in turn Connaughton, 491 U.S. at 693)); see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 332, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). I state only that, under the *541 circumstances of this case, summary judgment is inappropriate because a jury could reasonably find constitutional malice by inferring that Nichols and CPC subjectively entertained serious doubts as to the veracity of the rumor and that, by publishing the headline, CPC purposefully or recklessly contributed inaccurate facts that improperly enhanced the rumor.
“The United States Supreme Court has explained:
“ ‘[Wjhere the New York Times [Co. v. Sullivan] “clear and convincing” evidence requirement applies, the trial judge’s summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that eviden-tiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns [constitutional] malice, clearly a material issue in a New York Times [Co. v. Sullivan ] case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown [constitutional] malice by clear and convincing evidence or that the plaintiff has not.’
“Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (footnote omitted). The Supreme Court of Alabama has reiterated that ‘[a] trial judge is not required “to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.’” Camp v. Yeager, 601 So.2d [924,] 927 [(Ala.1992)] (quoting Anderson, 477 U.S. at 249, 106 S.Ct. 2505).”
Gary v. Crouch, 923 So.2d at 1138-39. On appeal from a summary judgment, this court reviews the case de novo, applying the same standards as the trial court. See id. Based on my review of the evidence, I conclude that the trial court erred in entering a summary judgment in favor of CPC and Nichols on Little’s libel claim. From the evidence in the record, a jury could be clearly convinced that Nichols and CPC published a false and defamatory rumor about Little in reckless disregard of the truth or the falsity of that rumor.
PITTMAN, J., concurs.

. Little arguably claimed in the trial court that he had also been defamed by other statements contained in editorials published in The Anniston Star; however, on appeal, Little does not argue that the trial court erred in entering a summary judgment as to any libel claim based on those other statements. Hence, I do not address those claims. See Rogers & Willard, Inc. v. Harwood, 999 So.2d 912, 923 (Ala.Civ.App.2007) ("This court will not consider on appeal issues that are not properly presented and argued in brief.”).

. Little takes issue with that argument. Little contends that, in her affidavit, Nichols stated only that Spain had told her that he had heard a rumor that Little was or had been involved personally with Jackson but that, later, in her deposition, Nichols added that Spain had also stated that the rumor accused Little of pushing for the audit due to that personal relationship. I disagree. In her affidavit, Nichols stated generally that Spain had made all the statements that she had attributed to him in the story, which would include the statement that it was rumored that Little had pushed for the audit due to his alleged personal relationship with Jackson. In her affidavit, Nichols did not further address that particular allegation made by Spain, but the fact that she did not further discuss the allegation does not render her later, more specific, deposition testimony inconsistent with her affidavit. Hence, I conclude that the record contains essentially undisputed evidence indicating that, in the story, Nichols simply reproduced the statements made by Spain.

. Several other authorities have reached the same or similar conclusions. See Dun & Bradstreet, Inc. v. Robinson, 233 Ark. 168, 172, 345 S.W.2d 34, 37 (1961) (defendant must prove truth of substance of rumor even though report included disclaimer “it is currently reported”); Hope v. Hearst Consol. Publ’ns, Inc., 294 F.2d 681, 682 (2d Cir.1961) (upholding jury award in libel suit based on gossip-column item that began "Palm Beach is buzzing with the story.... ”); and Thackrey v. Patterson, 157 F.2d 614, 614 n. 1 (D.C.Cir.1946) (reversing dismissal of complaint in libel suit based on article reporting "conjectures” and "saucy little rumors” about plaintiffs).

. After applying for rehearing, CPC and Nichols orally argued before this court that they also had a qualified privilege under Restatement (Second) of Torts § 602 and the “neutral-reporting privilege” espoused in Edwards v. National Audubon Society, Inc., 556 F.2d 113, 120 (2d Cir.1977). I also note that the main opinion relies, in part, on Edwards. However, those privileges were not asserted before the trial court, and this court cannot affirm the summary judgment on the basis of those privileges without denying Little due process. See Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., *537 P.C., 881 So.2d 1013, 1020 (Ala.2003). Moreover, this court has not been directed to any binding precedent in which the appellate courts of this state have adopted either privilege. Compare Wilson v. Birmingham Post Co., 482 So.2d 1209, 1212-13 (Ala.1986) (relying on Edwards) with Wiley, 495 So.2d at 619 (rejecting "newsworthiness" as basis for qualified privilege recognized in Edwards). Although CPC and Nichols urge this court to change Alabama law to include those privileges, in light of their failure to properly raise the applicability of those privileges before the trial court and to obtain a ruling on the matter, I find this to be an inappropriate case in which to consider taking that action.

. The main opinion asserts that Wiley conflicts with the holding in Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). I disagree. As explained by our supreme court in Ex parte Rudder, 507 So.2d 411, 415-16 (Ala.1987), in Hepps the United States Supreme Court held only that the First Amendment requires a private-figure plaintiff to prove the falsity of the defamatory statement when the speech involves a matter of public concern, thereby preempting the common-law rule placing the burden of proving the truth of the statement on the defendant. Nothing in Wiley contradicts any statement of the law made in Hepps. Thus, Wiley has never been overruled and remains binding on this court. See Ala. Code 1975, § 12-3-16.